**Aime LaCHANCE, Plaintiff,**

v.

**NORTHEAST PUBLISHING, INC., d/b/a Fall River Herald, Defendant.**

**Civil Action No. 96–11142–NG.**

United States District Court, D. Massachusetts.

April 21, 1997.

Richard M. Pierce, Adam C. Robitaille, Roberts, Carroll, Feldstein & Tucker, Providence, RI, for plaintiff.

Harold N. Mack, Morgan, Brown & Joy, Boston, MA, for defendant.

## MEMORANDUM AND ORDER

GERTNER, District Judge.

TABLE OF CONTENTS
MEMORANDUM AND ORDER
April 21, 1997

I. BACKGROUND ................................................... 179

II. STANDARD OF REVIEW ........................................ 179

III. DISCUSSION .................................................... 179
    A. From Gardener-Denver to Gilmer ........................ 180
    B. The Case At Bar ........................................... 184
        1. Claim Not Covered by the Arbitration Agreement Are Not Precluded From Litigation in a Federal Forum ............................... 184
        2. ADA Claims ........................................... 185
            a. Reasonable Accommodations ....................... 185
            b. Legislative History of the ADA ...................... 186
            c. State Age and Handicap Discrimination Claims ...................... 187
        3. The Arbitration Clause Arises From the Collective Bargaining Agreement ........................................... 188

IV. POST–GILMER CASELAW ....................................... 189

V. CONCLUSION ................................................... 190

Plaintiff Aime LaChance ("LaChance") filed a complaint alleging that his employer, defendant Northeast Publishing, Inc. ("Northeast"), illegally terminated him in violation of the Americans With Disabilities Act, 42 U.S.C. § 12101 (1996), handicap discrimination, and Mass. Gen. Laws ch. 151B § 4 (1996), handicap discrimination and age discrimination. Northeast has moved for summary judgment, contending that LaChance is precluded from bringing his statutory discrimination claims because he is subject to an arbitration clause in a collective bargaining agreement. For the foregoing reasons, the defendant's motion for summary judgment is **DENIED.**

## I. BACKGROUND

Northeast terminated LaChance from his job as copy editor in November, 1994. According to LaChance, he suffered from Carpal Tunnel Syndrome and required accommodation to perform his job. At the time of termination, the terms and conditions of LaChance's employment were governed by a collective bargaining agreement (hereinafter "the CBA"). The CBA was negotiated by Northeast and The Newspaper Guild of Greater Boston, Local 32 ("Local 32"). On March 14, 1995, pursuant to the CBA, Local 32 filed a demand for arbitration on LaChance's behalf to challenge the termination. The arbitration hearing is currently pending.

In May, 1995, LaChance also filed a charge with the Massachusetts Commission Against Discrimination ("MCAD") and the Equal Employment Opportunity Commission ("EEOC"), alleging handicap discrimination in violation of the Americans With Disabilities Act ("ADA"), and age discrimination and handicap discrimination in violation of Mass. Gen. Laws ch. 151B § 4 ("151B"). After the MCAD issued a lack of probable cause finding, LaChance began this action in state court; Northeast removed the case to federal court.

The CBA governing LaChance's employment contains a non-discrimination clause which provides:

> The parties hereto agree that there shall be no discrimination against an employee because of ... race, creed, age, sex, color, national origin, marital or parental status, sexual orientation, or handicap irrelevant to the performance of the job.

The CBA also contains an arbitration clause, which states, in relevant part:

> Any matter involving the interpretation, application, administration or alleged violation of this Agreement not satisfactorily settled within sixty (60) days ... may be submitted by either party to final and binding arbitration by filing a demand in accordance with the voluntary arbitration

rules of the American Arbitration Association.

Northeast claims that this agreement precludes the litigation of LaChance's statutory claims in a federal court forum. It insists that LaChance's discrimination claims are based on acts of the employer which, if true, would be prohibited by the CBA. Consequently, Northeast contends that since the arbitration clause provides that any violation of the CBA must be arbitrated, LaChance cannot pursue his discrimination claims in this Court.

## II. STANDARD OF REVIEW

Northeast has filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). Since its motion refers to documents outside the pleadings, however, Northeast asks this Court to treat its 12(b)(6) motion as a motion for summary judgment. The plaintiff has assented to this request.

In a motion for summary judgment, the burden is on the moving party to establish the lack of a genuine, material factual issue. See Finn v. Consolidated Rail Corp., 782 F.2d 13, 15 (1st Cir.1986). Once the moving party has satisfied its burden, the non-moving party must affirmatively point to evidence that shows a real dispute of material fact. See Garside v. Osco Drug, Inc., 976 F.2d 77, 78 (1st Cir.1992). Summary judgment should only be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56.[1]

## III. DISCUSSION

This case concerns the impact of the Supreme Court's decision in Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) on arbitration clauses in collective bargaining agreements where a plaintiff has asserted a claim under the Americans with Disabilities Act ("ADA"). Gilmer, at least on the surface, appeared to reverse more than a decade's worth of law which had held that an employee could never be obliged, as a condition of

---

1. Normally a motion for summary judgment would involve a discussion of the facts of the case. In this case, however, I am deciding a narrow issue of law related solely to the CBA and its arbitration clause; the facts underlying LaChance's claim are not relevant to this issue.

employment, to waive the right to resort to the federal courts to redress violations of various civil rights statutes.

Prior to *Gilmer*, in a series of decisions dating from the early 1970's, the Court held that federal courts, with Article III judges and representative juries, were uniquely suited to protect the civil rights of workers; the arbitral process—informal, with limited discovery, and focused on contractual, not public, rights—was not. The decisions reflected concerns that the freedom to contract for the terms and conditions of employment was not adequate to prevent discrimination against certain constitutionally protected classes, *e.g.* women, minorities, the disabled, and older workers.[2] Nor were unions the solution; their limitations in reconciling the needs of their minority members with their majority responsibilities were well known.[3] Bias against these groups would make fair bargaining, between parties of equal bargaining power, with meaningful negotiation, impossible.[4] Legislative intervention and resort to the federal forum were indispensable.

In contrast, in *Gilmer*, the Court held that a petitioner claiming a violation of the Age Discrimination in Employment Act ("ADEA"), had indeed waived his right to litigate the claim before an Article III judge and a federal jury, by signing a securities registration application which, in general terms, mandated arbitration. The earlier concerns—about the limitations of freedom of contract for members of protected groups, about the uniqueness of federal statutory protections—were less material, at least in the setting raised in *Gilmer*. And arbitration had, in a little over a decade, somehow shed its perceived limitations in enforcing federal statutory rights.

The defendants claim that *Gilmer* is dispositive; mandatory arbitration trumps La-Chance's right to this federal forum. I disagree. The case before me raises some of the issues litigated in *Gilmer* but in an entirely different setting—not an arbitration clause in an individual employment agreement, in which there is at least the fiction of individual bargaining, but in the context of an arbitration clause in a collective bargaining agreement, negotiated by a union representative, to which LaChance was bound solely by dint of membership in the union. Moreover, the arbitration clause at issue here is different from the broad clause at issue in *Gilmer*; it is limited on its face to contractual disputes. Finally, this case involves an entirely different statute, the Americans with Disabilities Act, with complex requirements, less suited to arbitration than the ADEA. These different circumstances require a different result than in *Gilmer*.

## A. *From Gardner–Denver to Gilmer*

The case law on whether statutory civil rights protections could be waived in collec-

---

2. *See generally* John Donohoe, *Employment Discrimination Law in Perspective: Three Concepts of Equality*, 92 Mich. L.Rev. 2583, 2596–98 (1994) (discussing why labor markets are not as efficient as capital markets, and, as a result, "employers often use cheap proxies such as race and sex to approximate true worker value."); *see also* Taub & Schneider, "Women's Subordination and the Role of Law," *in The Politics of Law: A Progressive Critique* 151, 155 (Kairys, ed.1990).

3. As two commentators have noted:

In the normal course of collective bargaining between labor and management, one would expect union bargainers to be greatly concerned with any form of discrimination that could lead to unfair treatment of workers and potential workers, whether such discrimination is based on membership in the union (with which unions are concerned) or on race, gender, or other forms of non-job-related discrimination (with which most unions seem to have very little effective concern). At least partially because unions did not act to protect racial minorities, women, and other oppressed groups from discrimination, Congress stepped in and mandated such protection in a series of statutes that prohibit discrimination on the basis of race, color, gender, national origin, religion, age and disability.

Thomas Earl Geu & Martha S. Davis, *Work: A Legal Analysis in the Context of the Chanaina Transnational Political Economy*, 63 U. Cinn. L.Rev. 1679, 1696 (1995).

4. *See* Donohoe, *supra* note 2, at 2611. "The passage of Title VII would not have been possible without the conceptual and political shift that allowed a majority of the public to embrace the view that federal regulation of employment was needed to correct the injustice being visited on black Americans. In the late days of the debate over Title VII, women succeeded in becoming one of the protected categories that benefited from this conceptual and political development."

tive bargaining agreements could not be clearer or of longer standing. It is framed by three Supreme Court decisions: *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), *Barrentine v. Arkansas–Best Freight Sys., Inc.*, 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981), and *McDonald v. City of West Branch*, 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984).

In *Alexander v. Gardner–Denver Co., supra*, the Supreme Court held that the petitioner was not precluded from bringing a Title VII claim by the prior submission of his discrimination claim to final arbitration under a collective bargaining agreement. In so doing, the Court sounded several strong themes:

(1) The Court noted that the doctrine of election of remedies was inapplicable to these federal civil rights claims because of the "distinctly separate nature of ... contractual and statutory rights"; an agreement which limited contractual claims to a certain forum would not affect statutory claims (the "uniqueness of the statutory remedies" theme). *Id*, at 50, 94 S.Ct. at 1020–21.[5]

(2) This was particularly the case given the "purpose and procedures" of Title VII. Consistent with Congress' view that the policy against discrimination be afforded the "highest priority," Title VII allowed individuals to pursue remedies in multiple forums (the "Congressional intent" theme). *Id.* at 49, 94 S.Ct. at 1020.[6]

(3) The Court emphasized that the arbitral process was not suited to the effective enforcement of Title VII (the "competence of the arbitrator" theme). *Id.* at 55–60, 94 S.Ct. at 1023–25. The process was informal; it had limited factfinding capabilities. Its exclusive focus was on the contractual provisions and the intent of the parties, rather than statutory obligations and public law.

(4) Finally, in language as applicable today as at the time of the decision, the Court held that while a union can waive certain statutory rights related to collective activity, like the right to strike, it cannot waive an *individual* employee's rights under Title VII (the "individual rights vs. collective rights" theme). *Id.* at 51, 94 S.Ct. at 1021. The Court noted:

> ... These rights [rights related to collective activity, such as the right to strike] are conferred on employees collectively to foster the processes of bargaining and properly may be exercised or relinquished by the union as collective-bargaining agent to obtain economic benefits for union members. Title VII, on the other hand, stands on plainly different ground; it concerns not majoritarian processes, but an individual's right to equal employment opportunities. Title VII's strictures are absolute and represent a congressional command that each employee be free from discriminatory practices. Of necessity, the rights conferred can form no part of the collective bargaining process since waiver of these rights would defeat the paramount congressional purpose behind Title VII...

*Id.* at 51, 94 S.Ct. at 1021.

Over the next decade, the Court reaffirmed these themes. Applying *Gardner–Denver* to the Fair Labor Standards Act ("FLSA"), the Supreme Court held that the submission of an employee's claim for violation of FLSA's minimum wage provisions to arbitration pursuant to the union's collective bargaining agreement did not preclude a later lawsuit. *Barrentine v. Arkansas–Best Freight Sys., Inc.*, 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981). Focusing especially on the limitations of the arbitral process and the tension between individual and collective rights, the Court noted that arbitral procedures in a collective bargaining setting were not as protective of individual stat-

**5.** The Court underscored the distinctive statutory scheme set up by Title VII—submission of a claim to a specially qualified agency, the EEOC, for "conference, conciliation, and *persuasion*," with a parallel role for individuals acting as private attorneys-general to bring actions independently of the EEOC. *Gardner–Denver*, 415 U.S. at 44, 45, 94 S.Ct. at 1017–18, 1018.

**6.** For example, an *individual* may bring an action in federal court whether or not the EEOC has found probable cause. 42 U.S.C. § 2000e–5(f); *Gardner–Denver*, 415 U.S. at 47, 94 S.Ct. at 1019.

utory rights—like rights under FLSA—as were federal judicial procedures. *Id.* at 737–738, 101 S.Ct. at 1443.[7] And in reviewing the intent of the FLSA, and its unique provisions, the Court concluded that under FLSA, Congress created a non-waivable public law right to minimum wage and overtime pay analogous to the non-waivable public law right not to be discriminated against found in Title VII.

Again, in *McDonald v. City of West Branch*, 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984), the Supreme Court held that an adverse arbitration award pursuant to a collective bargaining agreement did not preclude the employee from bringing a civil rights claim in federal court under 42 U.S.C. § 1983. In *McDonald*, as in *Gardner–Denver* and *Barrentine*, the Court concluded that Congress intended § 1983 to be judicially enforceable and further, that giving preclusive effect to arbitration would undermine the enforcement of these federal rights. *Id.* at 291, 104 S.Ct. at 1803–04. Arbitral factfinding, the Court found, is "generally not

the equivalent to judicial factfinding," *id.* at 291, 104 S.Ct. at 1803; it cannot provide an adequate substitute for judicial administration of § 1983 rights. *Id.* at 291, 104 S.Ct. at 1803–04.

*Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) seemed to strike out in a different direction. The *Gilmer* Court addressed at least three of the themes of *Gardner–Denver*—the intent of the legislation at issue in *Gilmer*, the ADEA; the uniqueness (or lack thereof) of the statutory protection for individual rights; and the competence of the arbitral process to protect individual rights—and, on the record before it, came to different conclusions. The Court appeared to recast arbitration in an entirely different light, now touting the competence of arbitrators to resolve statutory rights disputes fairly, and de-emphasizing the difference between arbitral factfinding and judicial factfinding, between statutory and contractual rights.[8] In

---

7. First, the Court was concerned with the circumstances of a worker's representation by the union during arbitration:

> Even if the employee's claim were meritorious, his union might, without breaching its duty of fair representation, reasonably and in good faith decide not to support the claim vigorously in arbitration. Wage and hour disputes that are subject to arbitration under a collective-bargaining agreement are invariably processed by unions rather than by *individual* employees. Since a union's objective is to maximize overall compensation of its members, not to ensure that each employee receives the best compensation deal available ... a union balancing individual and collective interests might validly permit some employees' statutorily granted wage and hour benefits to be sacrificed if an alternative expenditure of resources would result in increased benefits for workers in the bargaining unit as a whole.

*Id.* at 742, 101 S.Ct. at 1445–46.

Second, the Court was concerned with an arbitrator's limited powers:

> Second, even when the union has fairly and fully presented the employee's wage claim, the employee's statutory rights might still not be adequately protected. Because the 'specialized competence of arbitrators pertains primarily to the law of the shop, not the law of the land' ... many arbitrators may not be conversant with the public law considerations underlying the FLSA.

*Id.* at 743, 101 S.Ct. at 1446.

8. The *Gilmer* Court relied on *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 625–26, 105 S.Ct. 3346, 3353–54, 87 L.Ed.2d 444 (1985) and its progeny, for the proposition that arbitral fora are competent to adjudicate controversies based on statutes. As the Court noted in *Mitsubishi*: "By agreeing to arbitrate a statutory claim, a party does not forego the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Id.* at 628, 105 S.Ct. at 3354; cited in *Gilmer*, 500 U.S. at 29, 111 S.Ct. at 1653–54. Starting with *Mitsubishi*, the Court held that parties to contracts with arbitration clauses dealing with certain statutes, like federal antitrust or securities laws, were limited to arbitral remedies given the language of those statutes, their legislative history, and the Court's new view of the competence of the arbitrator. *See Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987) (holding plaintiff's RICO claim was subject to mandatory arbitration) *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) (holding plaintiff's claims under the Securities Act of 1933 are subject to mandatory arbitration). *But see Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987) (holding Railway Labor Act's arbitration procedures do not trump a railroad worker's right to bring a FELA action in federal court).

fact, on the record in *Gilmer,* the Court was prepared to say that an arbitration was the functional equivalent of a judicial proceeding before an Article III judge. It thus reversed *Gardner–Denver's* rule that the right to resort to a federal forum under the civil rights statutes could never be waived. That right could *sometimes* be waived. The issue was when.

Citing expressly to the Federal Arbitration Act ("FAA"),[9] the Court now found a Congressional presumption in favor of arbitration, unless the party could demonstrate that (a) Congress intended otherwise in the context of a given legislative scheme or (b) where the parties expressly demonstrated the limitations of arbitration.[10]  *Id.* at 26, 31, 111 S.Ct. at 1652, 1654–55.

In *Gilmer,* the plaintiff did neither. He offered nothing in the ADEA statute or its legislative history that could rebut this presumption. While the Court had found the statutory provisions at issue in the earlier cases, Title VII, the FLSA, and § 1983, to be unique and to require access to the federal courts, in *Gilmer,* the Court found no inherent conflict between arbitration and the ADEA's underlying purpose.  *Id.* at 26, 111 S.Ct. at 1652. In addition, the Court found

that while Gilmer had alleged that arbitration was inadequate to protect his federal rights, he had not proved it.  *Id.* at 30–31, 111 S.Ct. at 1654–55 (describing the arguments as "generalized attacks" and observing that Gilmer had failed to show that the rules of the NYSE were "inadequate to guard against potential bias").

But the Court expressly reaffirmed one theme of *Gardner–Denver* and its progeny— the concern about the tension between individual rights and collective rights.  *Id.* at 35, 111 S.Ct. at 1656–57.[11] Although it held that an employee could waive the right to litigate claims in a federal forum, and seemed unwilling to damn the competence of arbitrators generally to enforce federal civil rights, it indicated that there may well be circumstances in which waiver of federal rights would be suspect.[12] Mandatory arbitration in a collective bargaining agreement was one such circumstance.

The *Gilmer* Court recognized that different concerns arise when arbitration is waived pursuant to a collective bargaining agreement than are present when an individual supposedly bargains for his own contract.  *Id.* at 35, 111 S.Ct. at 1656–57. Likewise, the Court was concerned about whether the un-

---

**9.** The *Gilmer* court distinguished *Gardner–Denver* and its progeny by noting that they were not decided under the FAA with its strong pro-arbitration policy.

The FAA, originally enacted in 1925 as the United States Arbitration Act, 9 U.S.C. §§ 1 *et seq,* was in effect when *Gardner–Denver, Barrentine,* and *McDonald* were decided, but was not mentioned by the Court in any of those decisions. In *Gardner–Denver,* however, the Court noted that the Court of Appeals had ruled the employee's claim arbitrable based on "notions of election of remedies and waiver and by the federal policy favoring arbitration of labor disputes ..." 415 U.S. at 45–46, 94 S.Ct. at 1018–19. (citations omitted). The *Gardner–Denver* Court clearly disagreed with the importance that the lower court assigned to the federal favoritism of arbitration. *Id*

**10.** The Court also raised concerns about circumstances of the waiver, concerns not implicated in the *Gilmer* case.  *Id.* at 33, 111 S.Ct. at 1655–56.

**11.** In distinguishing the *Gardner–Denver* line of cases, the Court stated:

[B]ecause the arbitration in those cases occurred in the context of a collective-bargaining agreement, the claimants there were represented by their unions in the arbitration proceedings. An important concern therefore was the tension between collective representation and individual statutory rights.
*Id.*

**12.** Another situation which the Court in *Gilmer* left open concerned the circumstances under which an individual waived the right to a federal forum. Gilmer's case did not raise these issues: "There is no indication in this case, however, that Gilmer, an experienced businessman, was coerced or defrauded into agreeing to the arbitration clause in his registration application." *Gilmer,* 500 U.S. at 33, 111 S.Ct. at 1656. More compelling evidence could well persuade a court that a claimed waiver was invalid. Such evidence could suggest coercion or fraud or the lack of knowing and voluntary waiver, or suggest such unequal bargaining power that would lead to an unenforceable adhesion contract. *See, e.g., Mago v. Shearson Lehman Hutton, Inc.,* 956 F.2d 932, 934 (9th Cir.1992) (remanding to district court on factual issue of adhesion).

ion could adequately represent the individual litigant in the arbitration itself.[13]

In addition, in evaluating whether arbitration under a given agreement was adequate to protect federal rights, the Court compared the breadth of the arbitration agreement in *Gilmer* with the more narrow agreement in *Gardner–Denver*. The arbitration agreement in *Gilmer* referred to all disputes arising from employment, and therefore the employee was held to compulsory arbitration of all claims, including statutory claims. Conversely, the arbitration agreements in *Gardner–Denver* and its progeny required arbitration only for disputes arising from the collective bargaining agreement. *Gilmer*, 500 U.S. at 35, 111 S.Ct. at 1656–57. Since a labor arbitrator "has authority only to resolve questions of contractual rights," and must do so in a way that would effectuate the intent of the parties, the Court reasoned that the arbitrator, whose only source of authority is the CBA itself, is not empowered to resolve statutory claims. *Id.* at 34–35, 111 S.Ct. at 1656–57.

## B. *The Case At Bar*

■ The facts in this case are precisely what the Court distinguished in *Gilmer*: (1) the arbitration clause refers only to contractual claims; (2) the statute at issue, the ADA, is less conducive to arbitration than was the ADEA in *Gilmer*; and, (3) the arbitration agreement arises from a collective bargaining agreement, not individual bargaining.[14]

13. These are precisely the concerns spelled out in *Barrentine,* discussed at p. 181–182.

14. The only distinction not discussed here is the applicability of the FAA. It is not clear whether collective bargaining agreements are covered by the FAA. The First Circuit has held that the FAA may apply to collective bargaining agreements. *See Local 205, United Electrical, Radio and Machine Workers of America v. General Electric Co.,* 233 F.2d 85 (1st Cir.1956); *Electronics Corp. of America v. International Union of Electrical, Radio and Machine Workers,* 492 F.2d 1255 (1st Cir.1974). The Supreme Court, however, has declined to address the issue directly, and certainly did not apply the FAA (nor its predecessor, the United States Arbitration Act) to the arbitra-

## 1. *Claims Not Covered by the Arbitration Agreement Are Not Precluded From Litigation in a Federal Forum*

As in *Gardner–Denver,* the arbitration agreement between Northeast and the union is limited to matters involving the interpretation, application, administration or alleged violation of the CBA. On its face, it refers only to disputes covered by the agreement, and does not address statutory claims.

Northeast contends that this is a distinction without a difference, that LaChance's statutory, discrimination claims are based on alleged actions of the employer which also violate the nondiscrimination clause of the CBA.

■ I disagree. Contractual rights and statutory rights have independent origins, and are governed by different norms of interpretation: Contractual rights arise from the agreement created by the parties, whereas federal statutory rights are granted by Congress. Put simply, employers must abide by the ADA—whether they choose to or not. While contractual rights are supposed to reflect the intent of the parties entering into the agreement, statutory rights reflect Congress' concern and federal statutory precedent. Statutory rights are not abrogated simply because contractual rights are violated as a result of the same factual occurrence. *See Gilmer,* 500 U.S. at 34, 111 S.Ct. at 1656. Therefore, where the arbitration agreement only agrees to arbitrate claims arising from rights provided in the CBA, an employee cannot be precluded from bringing separate statutory claims, even when the two claims arise out of the same factual scenario.[15]

tion agreements at issue in *Gardner–Denver* and its progeny.

15. Even if the arbitration clause in the collective bargaining agreement referred to "any and all disputes," this still might not bar LaChance's statutory claims. The Supreme Court has held that unions cannot prospectively waive an individual employee's statutory Title VII rights. *Gardner–Denver,* 415 U.S. at 44–51, 94 S.Ct. at 1017–21. *See also supra* p. 181.

Similarly, the Supreme Judicial Court of Massachusetts has stated that the rights provided in Mass. Gen. Laws ch. 151B "are of a personal, and not merely economic, nature, [and therefore] are beyond a labor union's ability to bargain away." *School Comm. of Brockton v. Massachusetts Comm'n Against Discrimination,* 377 Mass. 392, 399, 386 N.E.2d 1240, (1979).

## 2. ADA Claims

The intent of the Americans with Disability Act and its structure are at odds with mandatory arbitration. If the "purpose and procedures of the statute strongly suggest that an individual does not forfeit his grievance to final arbitration under the nondiscrimination clause of a collective bargaining agreement," then the statutory claim should not be barred. *Gardner–Denver*, 415 U.S. at 49, 94 S.Ct. at 1020.

Congress enacted the ADA "to establish a clear and comprehensive prohibition of discrimination on the basis of disability," and to bring those individuals into the economic and social mainstream of American life. H.R.Rep. No. 485(II), 101st Cong., 2d Sess. 1990, *reprinted in* 1990 U.S.C.C.A.N. 303. Like Title VII, the ADA protects the disabled individual's right to be free from discriminatory practices on the job.

### a. Reasonable Accommodations

In addition, the ADA *requires* an employer to provide reasonable accommodations to disabled workers.[16] LaChance requested reasonable accommodation from Northeast in the spring of 1994. The CBA contains no such provision concerning accommodation; it only prohibits discrimination on the basis of handicap irrelevant to job performance. Therefore, an arbitrator, whose only source of authority is the CBA itself, is certainly not required, and may not even be empowered, to demand accommodation as a remedy for a disabled employee.[17]

This difference clearly cuts against the application of *Gilmer*. The *Gilmer* Court pivoted its willingness to equate the judicial and arbitral fora on the ability of the pro-

spective litigant to "effectively ... vindicate [his or her] statutory cause of action in the arbitral forum ..." 500 U.S. at 28, 111 S.Ct. at 1653 (citing *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 637, 105 S.Ct. 3346, 3359, 87 L.Ed.2d 444 (1985)). *See Cole v. Burns Int'l Sec. Serv.*, 105 F.3d 1465, 1478 (D.C.Cir.1997) (stressing the requirement that the arbitral forum be as effective as the judicial one).

Under the CBA, accommodation is not a required remedy. Thus, if an arbitrator refused to award LaChance a reasonable accommodation, the award would not necessarily be overturned on appeal. First, an arbitrator's award *must* draw its essence from the agreement and must be within the limits of the arbitrator's contractual authority. *See El Dorado Tech. Serv. v. Union General De Trabajadores de Puerto Rico*, 961 F.2d 317, 319 (1st Cir.1992). Second, proper grounds for vacating an arbitrator's award are limited. *See Local 1445, UFCW v. Stop & Shop Co.*, 776 F.2d 19, 21 (1st Cir.1985)(holding that a court may only vacate an arbitrator's award if it was "unfounded in reason and fact; based on reasoning so faulty that no judge, or a group of judges, could have made such a ruling; or mistakenly based on a crucial assumption that is concededly a non-fact"). Since the CBA does not mandate accommodation, and an arbitrator is certainly not required to follow external law, an arbitrator's award without accommodation may not be unreasonable.

The discrepancy between arbitral and judicial fora eviscerates the protections afforded by the ADA to disabled workers who are

---

16. Admittedly, the legal obligation of an entity to provide such an accommodation depends on whether the accommodation would impose an undue hardship on the entity's business. 42 U.S.C. § 12112(b)(5)(A). H.R.Rep. No. 485(III), 101st Cong., 2d Sess.1990, *reprinted in* 1990 U.S.C.C.A.N. 445.

17. It is not entirely clear whether a labor arbitrator is even allowed to consider "external law." The Supreme Court noted in *Gilmer* that "arbitrators do have the power to fashion equitable relief ... indeed, the NYSE rules applicable [to the arbitration in *Gilmer*] do not restrict the types of relief an arbitrator may award, but

merely refer to 'damages and/or other relief.' " 500 U.S. at 32, 111 S.Ct. at 1655. The Court also noted, however, that in the context of arbitration pursuant to a collective bargaining agreement, that "labor arbitrators are not authorized to resolve [statutory] claims." *Id.* at 33, 111 S.Ct. at 1655–56. *See also* Robert Perkovich, *Does Gilmer v. Interstate/Johnson Lane Corp. Compel the Consideration of External Law in Labor Arbitration?*, 25 Stetson L.Rev. 53, 54–61 (1995) (noting that the debate over the role of external law in labor arbitrations is still unresolved).

forced into arbitration. This is all the more troubling because the ADA's specific purpose was to insure that disabled individuals were not presumptively excluded from all areas of life, including employment. *See* 42 U.S.C. § 12101(a)(5);[18] *see also Bates v. Long Island Railroad Co.*, 997 F.2d 1028, 1034 (2d Cir.1993) (holding that plaintiff's claim under the National Rehabilitation Act, the predecessor to the ADA, did not have to proceed to arbitration since there are "certain instances when arbitration may be inadequate to protect an employee's rights."). Legally requiring employers to provide reasonable accommodations insures that qualified disabled employees are not needlessly and unfairly fired from jobs they could easily perform with certain adjustments.

Of even greater concern is the potential in arbitration for an industry to block the employment of qualified disabled workers under the cloak of custom. Typically, "[p]arties usually choose an arbitrator because they trust his knowledge and judgment concerning the demands and norms of industrial relations." *Gardner–Denver*, 415 U.S. at 57, 94 S.Ct. at 1024. Consequently, the arbitrator's ken "pertains primarily to the law of the shop, not the law of the land." *Id.* (citations omitted). In its report on the ADA, the House Committee on Education and Labor highlighted the intransigence of some employers to provide accommodations:

> [A] majority of accommodations provided by Federal contractors involved little or no cost ... Witnesses also explained that [while] there will be a need for more expensive accommodations as well, including readers for blind persons, interpreters for deaf persons, and physical accommodations for those with mobility impairments ...

costs for these accommodations are frequently exaggerated ...

H.R.Rep. No. 485(II), 101st Cong., 2d Sess. 1990, *reprinted in* 1990 U.S.C.C.A.N. 330. Considering these disputes from the perspective of the industry, as an arbitrator does, can perpetuate these kinds of barriers, especially when the refusal to make modifications constitutes a "law of the shop" or industry custom. *See Barrentine*, 450 U.S. at 743, 101 S.Ct. at 1446. *See generally,* Note, *Reconciling Conflicts Between the Americans with Disabilities Act and the National Labor Relations Act to Accommodate People with Disabilities,* 6 DePaul Bus. L.J. 387 (1994) (advocating a multifactor test to evaluate the reasonableness of a proposed accommodation that conflict with a CBA).

Congress actually anticipated this possibility. The legislative history of the ADA suggests a CBA provision, while a factor in determining what accommodation is reasonable, could not trump the ADA. *See* Staff of House Comm. on Education and Labor, 101st Cong., *Report on Americans with Disabilities Act* 28A, 130 (Comm. Print 1990) ("An employer cannot use a collective bargaining agreement to accomplish what it otherwise would be prohibited from doing under this legislation ... [though it would be] relevant ... in determining whether a given accommodation is reasonable.").[19]

### b. *Legislative History of the ADA*

Furthermore, Congress did not intend that arbitration agreements should preclude ADA statutory claims. Admittedly, the text of the ADA does encourage arbitration as an alternative method of dispute resolution, as does the legislative history. *See* 42 U.S.C. § 12212 (1996);[20] H.R. Conf. Rep. No. 596,

---

**18.** "... individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to less services, programs, activities, benefits, jobs, or other opportunities." 42 U.S.C. § 12101(a)(5).

**19.** The committee gave the following example: "For example, a collective bargaining agreement

that contained physical criteria which caused a disparate impact on individuals with disabilities and were not job-related and consistent with business necessity could be challenged under this legislation." *Id.*

**20.** Section 12212 of the ADA states that "[w]here appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including settlement negotiations, conciliation, facilitation, mediation, factfinding, mini-trials, and arbitration, is encouraged to resolve disputes arising under this chapter."

101st Cong., 2d Sess., at § 81 (1990), *reprinted in* 1990 U.S.C.C.A.N. 565. But the legislative history also explicitly states:

> It is the intent of the conferees that the use of alternative dispute resolution procedures is completely voluntary. Under no condition would an arbitration clause in a collective bargaining agreement or employment contract prevent an individual from pursuing their rights under the ADA.

*Id. See also* H.R. Conf. Rep. No. 558, 101st Cong, 2d Sess. 89 (1990), 1990 WL 259240; Staff of House Comm. on Education and Labor, 101st Cong., *Report on Americans with Disabilities Act* 28A, 94 (Comm. Print 1990); 136 Cong. Rec. H4582, H4606 (1990).

More pointedly, the report of the House Committee of the Judiciary explicitly indicated that Committee's intent that the *Gardner–Denver* rule apply to ADA claims:

> The Committee wishes to emphasize, however, that the use of alternative dispute resolution mechanisms is intended to supplement, not supplant, the remedies provided by this Act. Thus, for example, the Committee believes that any agreement to submit disputed issues to arbitration, whether in the context of a collective bargaining agreement or in an employment contract, does not preclude the affected person from seeking relief under the enforcement provisions of this Act. This view is consistent with the Supreme Court's interpretation of title VII of the Civil Rights Act of 1964, whose remedial provisions are incorporated by reference in title I. The Committee believes that the approach articulated by the Supreme Court in *Alexander v. Gardner–Denver Co.* applies equally to the ADA and does not intend that the inclusion of Section 513 [the section referencing the use of alternative dispute resolution] be used to preclude rights and remedies that would otherwise be available to persons with disabilities.

H.R.Rep. No. 485(III), 101st Cong., 2d Sess., at § 513 1990, *reprinted in* 1990 U.S.C.C.A.N. 445; *see also Block v. Art Iron, Inc.*, 866 F.Supp. 380, 386 (N.D.Ind.1994) (holding that plaintiff's ADA claim is not

governed by arbitration clause of CBA and plaintiff is not precluded from bringing claim because "the ADA's legislative history very strongly suggests that ADA claims may not be arbitrated in the absence of an express, voluntary waiver of the right to assert the claim in the courts."); *DiPuccio v. United Parcel Serv.*, 890 F.Supp. 688, 692–3 (N.D.Ohio 1995) (holding that plaintiff's ADA claim is not barred by failure to seek arbitration).

Therefore, though Congress wanted to encourage arbitration of ADA claims, it also clearly intended that aggrieved individuals retain the right to pursue a claim in a judicial forum. Precluding LaChance's claim would contravene the intent of the ADA.

### c. *State Age and Handicap Discrimination Claims*

■ The rights provided in ch. 151B § 4 are guaranteed to individuals. The "clear purpose of Mass. Gen. Laws ch. 151B is to implement the right to equal treatment guaranteed to all citizens." *Katz v. Massachusetts Comm'n Against Discrimination*, 365 Mass. 357, 366, 312 N.E.2d 182 (1974). In addition, the Supreme Judicial Court of Massachusetts has stated, "General Laws ch. 151B, § 4 concerns not collective processes, but rather each individual's right to equal employment opportunities." *School Comm. of Brockton v. Massachusetts Comm'n Against Discrimination*, 377 Mass. 392, 399, 386 N.E.2d 1240 (1979). *Cf. Carr v. Transgas, Inc.*, 35 Mass.App.Ct. 581, 585, 623 N.E.2d 505 (1993) (holding that an arbitrator's adverse finding did not preclude employee from bringing a discrimination claim in state court because there was no agreement to arbitrate that specific type of discrimination claim); *City of Boston v. Massachusetts Comm'n Against Discrimination*, 39 Mass.App.Ct. 234, 238, 654 N.E.2d 944 (1995) (stating, "[t]o be sure, submission to arbitration under a collective bargaining agreement does not give preclusive effect to the arbitral decision in a later statutory discrimination action brought before a court or specialized agency."). I pause to note, how-

---

This section by its terms does not provide for mandatory arbitration; indeed, the words of limitation "where appropriate" may suggest otherwise.

ever, that one Massachusetts Appeals Court has extended *Gilmer's* reasoning to a 151B claim in the context of an employment contract. *See Mugnano–Bornstein v. Crowell,* 42 Mass.App.Ct. 347, 677 N.E.2d 242 (1997) (holding that plaintiff's 151B claim was subject to mandatory arbitration since plaintiff had signed an employment contract agreeing to arbitrate "any controversy" arising out of her employment.). *Mugnano–Bornstein,* like *Gilmer,* did not involve a CBA, so its holding does not subtract from LaChance's case.

In conclusion, the purpose and procedures of 151B suggest that an individual does not lose the option to submit a claim in a judicial forum by submitting the same claim to arbitration, at least in the context of a CBA.

### 3. The Arbitration Clause Arises From the Collective Bargaining Agreement

Since the arbitration agreement between LaChance and Northeast arises out of a collective bargaining agreement, the concerns reflected by the Court from *Gardner–Denver* to *Gilmer* remain present—the circumstances of waiver of important statutory rights when that waiver was accomplished by a collectivity and not by LaChance individually.

Moreover, in any arbitration hearing, La-Chance would be represented by the union. The union's role in the hearing raises additional concerns about the adequacy of the arbitral forum. Though a union has a duty of fair representation to its members, that

duty is not the same as a lawyer's, nor is the setting in which that duty is fulfilled the same as a federal courtroom. *See Pryner v. Tractor Supply Co.,* 109 F.3d 354, 362 (7th Cir.1997) (observing that a union "may take into account such strategic factors such as its limited resources and consequent need to establish priorities . . . as well as its desire to maintain harmonious relations among the workers and between them and the employer").

Northeast argues that LaChance's statutory rights are not completely waived, but simply limited to the arbitral forum. But as the Supreme Court recognized in *Gilmer,* La-Chance's statutory rights may not be sufficiently protected in a labor arbitration where he is represented by the union. 500 U.S. at 35, 111 S.Ct. at 1656–57. Since the union's responsibility is to serve the collective whole, the individual employee's interests may be subordinated to the interests of the union. *See Emporium Capwell Co. v. Western Addition Comm. Org.,* 420 U.S. 50, 62, 95 S.Ct. 977, 983–84, 43 L.Ed.2d 12 (1975). While the union has a duty of fair representation to all employees, *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 909–10, 17 L.Ed.2d 842 (1967), that duty does not guarantee that the interests of minority groups are always fully represented.[21] Indeed, by definition, unions represent the interests of the *majority. See Emporium Capwell Co.,* 420 U.S. at 62, 95 S.Ct. at 984–85. Workers whose interests are inconsistent with that of the majority may not be adequately represented in an arbitration hearing.[22]

21. Congress itself recognized this problem and extended the ADA to protect employees against unions as well as employers. *See* 42 U.S.C. § 12112(b)(2). This provision no doubt reflects the labor movement's "long history" of mistreatment of minority workers. *See Pryner v. Tractor Supply Co.,* 109 F.3d 354, 362–63 (7th Cir.1997) (citing *Steele v. Louisville & Nashville R.R.,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944)).

In addition, the legal responsibilities imposed on employers under the ADA often directly conflict with the interests of the union. *See* Harvey S. Mars, *Collective Bargaining Under the Americans With Disabilities Act, Title I,* 66 N.Y. St. B.L. 36, 37 (1994); Note, *Reconciling Conflicts Between the ADA and the NLRA To Accommodate People With Disabilities,* 6 DePaul Bus. L.J. 387, 392–93 (1994). For example, an accommodation may involve transferring a disabled employ-

ee to a light work duty position, which may violate seniority rights collectively established by the union. *Id.*

22. The tension between collective representation and individual rights also exists in the bargaining process itself. In negotiating the collective bargaining agreement, a union may bargain away certain statutory collective rights. *Gardner–Denver,* 415 U.S. at 51, 94 S.Ct. at 1021. These rights, such as the right to strike, are conferred on employees collectively to foster the processes of bargaining. *Id.* Conversely, the right to equal employment opportunities is conferred on the individual, and does not implicate majoritarian processes. As the Supreme Court noted about Title VII rights, "[o]f necessity, the rights conferred can form no part of the collective-bargaining process . . . In these circumstances, an em-

These disparities take on increased importance in LaChance's case because, as discussed above, under the ADA, a qualified plaintiff may demand reasonable accommodation for his disability. An accommodation must be determined from the specific facts of the plaintiff's disability. Individualized representation is the key to this kind of determination. The federal regulations promulgated to implement the ADA make, this clear:

> This process of identifying whether, and to what extent, a reasonable accommodation is required should be flexible and involve both the employer and the individual with a disability. Of course, the determination of whether an individual is qualified for a particular position must necessarily be made on a case-by-case basis. No specific form of accommodation is guaranteed for all individuals with a particular disability. Rather, an accommodation must be tailored to match the needs of the disabled individual with the needs of the job's essential functions ... This process requires the individual assessment of both the particular job at issue, and the specific physical or mental limitations of the particular individual in need of reasonable accommodation.

29 C.F.R. § 1630, App. (1996). *See also ADA Handbook,* § 7.18 (2d ed.1990). The union cannot be counted on to provide LaChance with this kind of representation. *See Pryner v. Tractor Supply Co.,* 109 F.3d 354, 362–63 (7th Cir.1997) (cautioning that courts "may not assume that [the union] will be highly sensitive to [employees'] special interests ... and will seek to vindicate those interests with maximum vigor.").

Overall, it does not further the interests of justice or the goals of the ADA or 151B to deny LaChance the opportunity to pursue his claims in court.

## IV. POST-GILMER CASELAW

Northeast encourages me to follow a Fourth Circuit decision where the court enforced an arbitration provision in a collective bargaining agreement and held that the employee was precluded from pursuing employment discrimination claims under Title VII and the ADA. *Austin v. Owens–Brockway Glass Container, Inc.,* 78 F.3d 875 (4th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 432, 136 L.Ed.2d 330 (1996). The nondiscrimination clause at issue in *Austin* stated that the company would comply with "all laws preventing discrimination," and the arbitration clause applied to any disputes arising under the collective bargaining agreement. *Id.* at 879. The *Austin* court applied the reasoning from *Gilmer,* and held that the employee, through the collective bargaining agreement, had voluntarily agreed to arbitrate statutory claims. *Id.* at 885. The court also held that the text and the legislative history of Title VII and the ADA did not block arbitration as an appropriate forum. *Id.* Therefore, the arbitration provision was enforced and the petitioner's statutory claims were precluded.

I decline to follow *Austin* for a number of reasons. First, the nondiscrimination clause in *Austin* incorporated statutory rights, whereas the nondiscrimination clause in this case does not. Second, in light of the legislative history of the ADA addressing the issue of arbitration, *see supra* p. 185, I find it incongruous that the *Austin* court found no "Congressional hostility towards arbitration." 78 F.3d at 881. Lastly, and most importantly, I think the Fourth Circuit erred in failing to address the Supreme Court's recognition of the continuing viability of *Gardner–Denver.*[23] Therefore, I reject the Fourth Cir-

---

ployee's rights under Title VII are not susceptible to prospective waiver." *Id.* at 51–52, 94 S.Ct. at 1021.

**23.** *See also Pryner v. Tractor Supply Co., Inc.,* 927 F.Supp. 1140, 1145–46 (S.D.Ind.1996) (declining to follow Austin because its "reliance upon *Gilmer* to the exclusion of *Gardner–Denver* is clearly misplaced") (subsequent history discussed at p. 190); *Bush v. Carrier Air Conditioning,* 940 F.Supp. 1040, 1046 (E.D.Tex.1996) (stating "this court rejects the Fourth Circuit's extension of

*Gilmer"* and following the holding of *Gardner–Denver* ); *Buckley v. Gallo Sales Co.,* 949 F.Supp. 737, 742–43 (N.D.Cal.1996) (holding that plaintiff's ADA claim was not subject to arbitration and disagreeing with *Austin* because of its erroneous statement of the law and failure to recognize the importance of the CBA). *But see Bright v. Norshipco & Norfolk Shipbuilding and Drydock Corp.,* 951 F.Supp. 95, 96–97 (applying *Austin* and pausing to note, "[u]ntil we solve the ills besieging our courts, I urge the United States Supreme Court, the Fourth Circuit, and all other

cuit's expansion of *Gilmer* to cases involving collective bargaining agreements.[24]

## V. CONCLUSION

LaChance is not precluded from pursuing statutory discrimination claims in a judicial forum by the presence of a non-discrimination clause and an arbitration clause in the collective bargaining agreement. The defendant's motion for summary judgment is **DENIED**.

**SO ORDERED.**

federal courts to favor the arbitration of disputes. For the record, this Court surely does."); *Jessie v. Carter Health Care Ctr.*, 930 F.Supp. 1174, 1176 (E.D.Ky.1996) (holding that nondiscrimination provision and arbitration clause precluded plaintiff from bringing her Title VII claims in court).

In addition, the Supreme Court recently affirmed the viability of *Gardner–Denver* and re-emphasized the distinctions between it and *Gilmer*, stating:

> In holding that an agreement to arbitrate an [ADEA] claim is enforceable under the [FAA], *Gilmer* emphasized its basic consistency with our unanimous decision in [*Gardner–Denver*] ... [which] permitt[ed] a discharged employee to bring a Title VII claim, notwithstanding his having already grieved the dismissal under a collective-bargaining agreement. *Livadas v. Bradshaw*, 512 U.S. 107, 127 n. 21, 114 S.Ct. 2068, 2080 n. 21, 129 L.Ed.2d 93 (1994).

**24.** Three other circuits court have examined this issue since *Gilmer:* the Second, Eighth, and Seventh Circuits. *See Tran v. Tran*, 54 F.3d 115, 118 (2d Cir.1995) (following *Barrentine*, and holding that the plaintiff was not required to seek arbitration of wage claims based on the Fair Labor Standards Act pursuant to an arbitration clause in a collective bargaining agreement); *Varner v. National Super Markets, Inc.*, 94 F.3d 1209, 1214 (8th Cir.1996) (holding that a plaintiff is not required to exhaust grievance and arbitration remedies to pursue a Title VII claim; "[w]e interpret this absolute grant of power to entail an absolute right to adjudicate suits under Title VII so long as the jurisdictional prerequisites dictated in Title VII itself are satisfied."); *Pryner v, Tractor Supply Co.*, 109 F.3d 354 (7th Cir.1997) (holding that plaintiffs' Title VII/ADEA/ADA claims should not be subject to arbitration since *Gardner–Denver*'s holding still applies).

The Third Circuit has also recognized *in dicta* that there are significant distinctions between *Gilmer* and *Gardner–Denver*, and consequently that cases involving collective bargaining agreements should be governed by *Gardner–Denver* and its progeny. *See Bolden v. Southeastern Pennsylvania Trasp. Auth.*, 953 F.2d 807, 826 (3d Cir.1991).