Susan **ROSENBERG**, Plaintiff,

v.

**MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.** and **John Wyllys,** Defendants.

No. 96–12267–NG.

United States District Court, D. Massachusetts.

April 23, 1997.

Barry Y. Weiner, Christopher P. Litterio, Shapiro, Israel & Weiner, P.C., Boston, MA, for defendants.

Steven T. Sager, Marc Redlich, Law Offices of Marc Redlich, Boston, MA, Richard P. Goodkin, Natick, MA, for plaintiff.

## TABLE OF CONTENTS—MEMORANDUM AND ORDER
### April 23, 1997

I. INTRODUCTION ...................................................191

II. BACKGROUND ...................................................192

III. DISCUSSION ...................................................193
    A. The Case Law From Alexander v. Gardner-Denver To Gilmer ...............193
        1. Alexander v. Garner-Denver........................................194
        2. Mitsubishi Motors ..............................................194
        3. Gilmer And The Issues That Remain To Be Litigated....................195
    B. The General Questions .........................................197
        1. Does Title VII Preclude Mandatory Arbitration Of Gender Discrimination Claims? .....................................197
            a. The Text Of Title VII .......................................197
            b. The Purposes Of Title VII ...................................198
            c. Inherent Conflict Between Arbitration And Statutory Rights Under Title VII ...........................................199
            d. Legislative History .........................................199
        2. Can The Plaintiff Demonstrate Systematic Arbitral Bias? .................201
        3. Assuming The Appropriateness Of Waiving Access To Federal Forum, Do The Circumstances Of Rosenberg's Waiver Meet The Legal Standards For Waiver? ...............................202
            a. Legal Standards ...........................................202
            b. Assuming A "Knowing and Voluntary" Standard, Was The Prospective Waiver Of Rosenberg's Right To Have Her Claims Resolved In A Judicial Forum "Knowingly And Voluntarily" Made? ........................................202
            c. Was There Fraud, Or Unequal Bargaining Power, Or Some Other "Contract Revocation" Ground Involved In Rosenberg's Alleged Agreement To Arbitrate?......................................203

IV. CONCLUSION ...................................................203

### MEMORANDUM AND ORDER

GERTNER, District Judge.

## I. INTRODUCTION

Plaintiff Susan Rosenberg ("Rosenberg") brought suit against her former employer, Merrill Lynch, and her former supervisor, John Wyllys (collectively "defendants"), alleging age and gender discrimination, as well as sexual harassment.[1] Defendants have moved to compel arbitration; they now seek a stay of the proceedings pending the outcome of that arbitration.

The defendants allege that when Rosenberg filled out what is known as a Form U–4, a prerequisite to becoming a securities broker, she agreed to arbitrate any and all claims against her employer. Rosenberg, they assert, has waived her statutory rights

---

[1]. Plaintiff sued in Superior Court in Suffolk County, Massachusetts, from which defendants removed this case. Plaintiff has not moved for remand. In her complaint, Rosenberg does not explicitly base her claims on federal law. Defen- dants contend that her claims arise out of 29 U.S.C. § 621 *et seq.* and 42 U.S.C. § 2000e *et seq.*, otherwise known as the ADEA and Title VII respectively. Rosenberg has not challenged these contentions.

under Title VII[2] to a judicial forum and a trial by jury, on the authority of *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). Prior to *Gilmer*, the Supreme Court had held that an individual employee could never waive his or her rights to litigate civil rights claims in a federal forum; the *Gilmer* decision appeared to hold otherwise, at least with respect to claims under the Age Discrimination in Employment Act ("ADEA").[3]

The issue before me is the application of *Gilmer* to the facts at bar. *Gilmer* raises two questions, one more general, one more specific. The general question is: Whether Rosenberg may be obliged as a condition of her employment to prospectively waive the right to litigate the Title VII claim in a federal forum, before an Article III judge and jury. That question involves two others: (a) Do the conclusions of *Gilmer* with respect to the ADEA apply as well to Title VII, as amended by the Civil Rights Act of 1991? and, (b) Do the conclusions of *Gilmer* with respect to the adequacy of the arbitral fora— that the arbitrators in the securities industry are unbiased, competent and effective to enforce federal civil rights claims—apply to the instant case?

The more specific question is: Assuming Title VII permits a prospective waiver of the right to a federal forum, does Rosenberg's waiver meet the legal standards? This question also has several sub-parts: (a) What are the standards governing the waiver of this statutory and perhaps, constitutional right to a jury trial? (b) Whether the circumstances surrounding Rosenberg's waiver in fact complied with those standards, i.e., was it knowingly and voluntarily made; and, (c) Whether her agreement to arbitrate was revocable, due to the employer's unequal bargaining power or any other "adhesion" arguments.

While I have addressed some of these issues in a decision issued April 21, 1997, *La-Chance v. Northeast Publishing Inc.*, 965 F.Supp. 177 (1997) (application of *Gilmer* to a mandatory arbitration clause in a collective bargaining agreement in an Americans with Disabilities Act case), I conclude that the

record in the instant case is presently inadequate on a number of levels for current resolution. Contrary to the position of the defendants, *Gilmer* is not dispositive; a number of issues were left open by the *Gilmer* Court, or were not presented at all. These issues need to be clarified before the matter before me can be resolved.

Accordingly, I **ORDER** additional briefing and discovery on certain legal issues—the application of *Gilmer* to the particular statutory schemes at issue here, gender discrimination and sexual harassment under Title VII, age discrimination under the Age Discrimination in Employment Act ("ADEA"), the adequacy of the arbitral scheme in the securities industry to enforce gender and age discrimination claims, the legal standards for waiver of the right to an Article III judge and representative jury, and finally, the particular circumstances of waiver in this case. (The briefing and discovery schedule are set forth in a separate order attached hereto.) I also request *amicus* participation on these issues, and invite counsel for both sides to solicit interested organizations to submit materials.

Accordingly, defendants' motion to compel arbitration is **DEFERRED** pending the additional discovery and briefing described above. With the exception of this discovery and briefing, the defendant's motion to stay the proceedings is **ALLOWED.**

## II. BACKGROUND

Rosenberg was forty-five years old when she was hired by Merrill Lynch on January 6, 1992 for employment in its Wellesley, Massachusetts office. She began in a training program for financial consultants known as the Professional Development Program; this program normally lasts 29 months. On January 10, 1992, Rosenberg filled out a U–4 Form, which is the Uniform Application For Securities Industry Registration Or Transfer. People seeking to become securities brokers must file a U–4 form. The U–4 form required her to:

---

**2.** 42 U.S.C. § 2000e *et seq.*

**3.** 29 U.S.C. § 621 *et seq.*

... agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the organizations indicated in *item 10* as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgment in any court of competent jurisdiction. (emphasis added.)

Rosenberg claims she did not personally check any of the boxes in item 10, nor did she authorize anyone to check the boxes for her. Item 10 lists the various organizations, such as the New York Stock Exchange ("NYSE") and National Association of Securities Dealers, Inc. ("NASD"), as well as the fifty states, in which one can become licensed to trade securities. A mark in the boxes on the U–4 form express the person's intent to join the various organizations indicated, and to be licensed to trade as a member of these organizations. Five of the boxes in item 10 on Rosenberg's U–4 form, however, are marked: The boxes labeled ASE, CBOE, NASD, NYSE, and Massachusetts have all been marked with an X and circled.[4]

The record concerning Rosenberg's knowledge of the U–4 form and the arbitration clause is murky. First, Rosenberg claims she does not remember seeing these boxes checked when she signed the U–4. Second, she claims that she was never given a copy of the rules from the Securities Exchange Commission ("SEC"), NASD or *NYSE*, or any other organization, indicating that any and all employment disputes must be submitted to arbitration. Third, she claims she was never given any copies of, or otherwise made aware of, any amendments to the rules of these organizations. Finally, Rosenberg states that, to the best of her recollection, the Merrill Lynch Employee Handbook did not mention arbitration or indicate that by filling out a U–4 form, that she was agreeing to arbitrate any and all employment disputes.

Rosenberg finished the training program and became a financial consultant for Merrill Lynch on May 5, 1992. On March 9, 1994, Rosenberg claims that she was harassed by her supervisor John Wyllys ("Wyllys"), who handed her a phallus-shaped vibrator when she came into his office looking for a document. She claims she did not speak to him again until April 25, 1994, when she met with him to discuss her performance as a financial consultant. He raised his concern that her performance was not up to the expected levels and suggested she resign. The next day, Rosenberg called Wyllys to invite him to meet her for dinner and drinks to discuss his evaluation. On April 27, he accepted her invitation; at this dinner, Rosenberg told Wyllys she would not resign. On May 13, 1994, Merrill Lynch terminated Rosenberg for inadequate performance, i.e. lack of production.

According to Rosenberg, she was the only consultant in the Wellesley office who was over forty, among the consultants with a comparable length of service ("LOS") (two years). She claims she outperformed several of the other consultants in her two-year LOS group, and that she was the only one to be terminated in the several months before and after May 13, 1994. She alleges that her termination was the result of age and gender discrimination. In addition, she claims Wyllys sexually harassed her when he handed her the phallus-shaped vibrator while they were alone in his office.

## III.  DISCUSSION

### A.  *The Case Law From Alexander v. Gardner–Denver To Gilmer*

The starting point for analysis is the Supreme Court's decision in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). *Gilmer* sits at the intersection of two lines of cases. The first line of cases originated with *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), in which the Supreme Court unanimously held that federal courts with Article III judges and representative juries, were uniquely suited

---

**4.** The relevance of the other boxes aside from the NASD and NYSE has not been addressed by the parties.

to, and protective of, the civil rights of workers; the arbitral process—informal, with limited discovery, and focused on contractual, not public rights—was not.

The second line of cases, beginning with *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985), seemed to go in the opposite direction. In less than a decade's time, the Court found that the arbitral forum was presumptively competent to resolve certain statutory claims, where there had been a valid agreement to arbitrate, and where the statute involved did not preclude arbitration. *While Gilmer* took the *Mitsubishi* line and applied it to a NYSE arbitration agreement that mandated arbitration of a claim under the ADEA, a number of questions remained unanswered by the Court, questions which must be resolved in the instant case.

### 1. Alexander v. Gardner–Denver

In *Alexander v. Gardner–Denver Co.*, *supra*, the Supreme Court held that the petitioner was not precluded from bringing a Title VII claim by the prior submission of his discrimination claim to final arbitration under a collective bargaining agreement. In so doing, the Court sounded several strong themes (*see* discussion in *LaChance v. Northeast Publishing*, *supra*, 965 F.Supp. at 179–180):

(1) Because of the unique nature of the statutory claims at issue, as compared with contractual claims, the doctrine of "election of remedies" would not apply to preclude a Title VII action following arbitration. *Gardner–Denver*, 415 U.S. at 50, 94 S.Ct. at 1020–21. (This is the "uniqueness of the statutory remedies" theme.)

(2) The special significance of the procedures of Title VII, and its purposes—to afford Congress's "highest priority" to the policy against discrimination—strongly suggested that an individual be permitted to pursue remedies in multiple fora. *Id.* at 49, 94 S.Ct. at 1020. (This is the "congressional intent" theme.)

(3) The arbitral process was not suited to the effective enforcement of Title VII, for a number of reasons including its informality, the fact that there was limited discovery, that the arbitrator was obliged to effectuate the intent of the parties, and had "no general authority to invoke public laws that conflict with the bargain between the parties." *Id.* at 53, 55–60, 94 S.Ct. at 1022, 1023–25. (This is the "competence of the arbitrator" theme.)

(4) Finally, the Court was deeply concerned with the voluntariness of an individual's prospective waiver of a statutory civil right, especially in the context of a collective bargaining agreement. While a union can waive certain statutory rights related to collective activity, like the right to strike, it cannot waive an individual employee's rights under Title VII. *Id.* at 51, 94 S.Ct. at 1021. (This is the "individual rights vs. collective rights" theme.)

As noted in *LaChance, supra*:

The decision reflected concerns that the freedom to contract for the terms and conditions of employment was not adequate to prevent discrimination against certain constitutionally protected classes, *e.g.* women, minorities, the disabled and older workers.... Bias against these groups would make fair bargaining, between parties of equal bargaining power, with meaningful negotiation, impossible. Legislative intervention and the resort to a federal forum was indispensable.

*Id.* 965 F.Supp. at 179–180.[5]

### 2. Mitsubishi Motors

Ten years after *Gardner–Denver*, the Supreme Court did an about face with respect to the competence of an arbitral forum to

---

5. Over the next decade, the Court reaffirmed these themes. Applying *Gardner–Denver* to the Fair Labor Standards Act ("FLSA"), the Supreme Court held that the submission of an employee's claim for violation of FLSA minimum wage provisions to contractual dispute-resolution procedures pursuant to the union's collective bargaining agreement did not preclude a later lawsuit. *Barrentine v. Arkansas–Best Freight Sys., Inc.*, 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981). Again, in *McDonald v. City of West Branch*, 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984), the Supreme Court held that an adverse arbitration award pursuant to a collective bargaining agreement did not preclude the employee from later bringing a civil rights claim in federal court under 42 U.S.C. § 1983.

adjudicate controversies based on statutory rights, at least with respect to certain statutes. The *Gardner–Denver* Court's skepticism of arbitrators and the arbitral scheme in civil rights cases, *see* 415 U.S. at 56–58, 94 S.Ct. at 1023–25, devolved in *Mitsubishi* and its progeny to downright favoritism. Citing the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, the Court instructed that "we are well past the time when judicial suspicion of the desirability of arbitration and the competence of arbitral tribunals inhibited the development of arbitration as an alternative means of dispute resolution." *Mitsubishi*, 473 U.S. at 626–27, 105 S.Ct. at 3354.

*Mitsubishi* reversed *Gardner–Denver*'s presumptions. *See id.* at 628, 105 S.Ct. at 3354–55 ("Having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue"). The FAA, the Court held, created a presumption in favor of arbitrability; but because a private contract requiring arbitration cannot trump a statute, courts must still look to the language and legislative intent of the statute at issue to see if the presumption was rebutted. *Mitsubishi* placed the onus on plaintiffs to demonstrate a negative—that Congress intended that the statute *preclude* arbitration.

*Mitsubishi* itself dealt with antitrust claims made under the Sherman Act. Its holding was then extended in short order to claims brought under other business-related statutes. *See Shearson/American Express Inc. v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987) (RICO claims); *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) (claims under § 12(2) of the Securities Act of 1933).

Still, *Mitsubishi*'s conclusions were not extended to individual civil rights cases involving ADEA and Title VII claims. In fact, there were important policy reasons militat-

ing against the *Mitsubishi* result in civil rights cases. Bias against individuals, particularly on account of race or gender, arguably suffused the bargaining process and cast significant doubt on whether there had been meaningful negotiation, not to mention meaningful waivers of the right to an Article III judge and a representative jury. Such waivers could well be suspect for all the very reasons that made statutes guarding the rights of protected groups necessary in the first instance. Indeed, whatever the competence of arbitrators to resolve disputes in a commercial setting, some argued that the litigation of civil rights claims required different sensibilities. Civil rights litigation, it was argued, not only called for "dispute resolution," but also required the articulation of public rights and obligations. *See LaChance, supra*, 965 F.Supp. at 179–180; *see* section B, (1)(b) *infra.*

### 3.  *Gilmer And The Issues That Remain To Be Litigated*

In *Gilmer*, the Court held that a petitioner claiming a violation of ADEA had indeed waived his right to litigate in federal court by virtue of signing a securities registration application which mandated arbitration. "The earlier concerns—about the limitations of freedom of contract for members of protected groups, about the uniqueness of federal statutory protections—were less material, at least in the setting raised in *Gilmer*. And arbitration had, in a little over a decade, somehow shed its perceived limitations in enforcing federal statutory rights." *LaChance, supra*, 965 F.Supp. at 180. "[The *Gilmer* Court] thus reversed *Gardner–Denver's* rule that the right to resort to a federal forum under the civil rights statutes could never be waived. That right could *sometimes* be waived. The issue was when." *Id.* at p. 11, —— F.Supp. at ——.

The Court reiterated the rule of *Mitsubishi*. Owing to the FAA,[6] there was a congressional presumption in favor of arbitra-

---

6.  Ironically, the FAA, originally enacted in 1925 as the United States Arbitration Act, 9 U.S.C. § 1 *et seq.*, was in effect when *Gardner–Denver, Barrentine*, and *McDonald* were decided, but was not mentioned by the Court—and perhaps the parties. In *Gardner–Denver*, the Court had noted

that the Court of Appeals emphasized the federal policy favoring arbitration of labor disputes. 415 U.S. at 45–47 & n. 6, 94 S.Ct. at 1018–19 & n. 6. The *Gardner–Denver* Court clearly disagreed with the importance that the appeals court had assigned to the federal favoritism of arbitration.

tion—even in civil rights cases—unless the party could demonstrate that (a) Congress intended otherwise in the context of a given legislative scheme, or (b) where the parties expressly demonstrated the limitations of arbitration. *Gilmer,* 500 U.S. at 26, 31, 111 S.Ct. at 1652, 1654–55.

In *Gilmer,* as I noted in *LaChance, supra* 965 F.Supp. at 183 the plaintiff did neither. While the Court had found the statutory provisions at issue in the earlier cases, including Title VII, to be unique and to require access to the federal courts, in *Gilmer,* the plaintiff had failed to demonstrate any conflict between arbitration and the ADEA's underlying purpose. *Gilmer,* 500 U.S. at 26, 111 S.Ct. at 1652. In addition, the Court found that while Gilmer had alleged that arbitration was inadequate to protect his federal rights, his challenge amounted to "generalized" attacks on arbitration, without specific proof. *Id.* at 30–31, 111 S.Ct. at 1654–55.

Moreover, *Gilmer* expressly left open another challenge to mandatory arbitration. The Court reaffirmed one theme of *Gardner–Denver* and its progeny—the concern about the tension between individual rights and collective rights, *id.* at 35, 111 S.Ct. at 1656–57, and, in dicta, general concerns about the voluntariness of a waiver of statutory rights outside of a collective bargaining context. Although not raised by the facts of *Gilmer,* the Court indicated that there may well be circumstances in which individual waivers of federal rights would be suspect. "There is no indication in this case, however, that Gilmer, an experienced businessman, was coerced or defrauded into agreeing to the arbitration clause in his registration application." *Id.* at 33, 111 S.Ct. at 1656. Other cases—perhaps Rosenberg's—could raise such issues, ranging from outright coercion or fraud to the lack of knowing and voluntary waiver, or to circumstances suggesting the sort of unequal bargaining power that would lead to an unenforceable adhesion contract. *See. e.g., Mago v. Shearson Lehman Hutton, Inc.,* 956 F.2d 932, 934 (9th Cir.1992) (re-

manding to district court on factual issue of adhesion).

In short, *Gilmer* raises the following questions which are significant in this case:

● *Whether the intent or purposes of Title VII. and the ADEA preclude mandatory arbitration in lieu of resort to the federal forum.*

The instant case raises both ADEA and Title VII issues. While the ADEA issues were decided by *Gilmer,* the Court is obliged to delve more deeply with respect to the Title VII claims: The Court must examine the text of the statutes, their legislative history, and whether there is an inherent conflict between arbitration and the statutes' underlying purposes. *Gilmer,* 500 U.S. at 26, 111 S.Ct. at 1652.

Moreover, with respect to Rosenberg's ADEA claim, the Court is obliged to consider the impact of the Older Workers Benefits Protection Act, Pub.L. 101–433, 104, Stat. 978 (1990), codified at 29 U.S.C. § 626, on mandatory arbitration. In that act, Congress amended the ADEA to provide that "[a]n individual may not waive any right or claim under this Act unless the waiver is knowing and voluntary." *See id.* at § 626(f). Congress also specified certain conditions that must be met in order for a waiver to meet that standard. *Id.*[7]

● *Whether this plaintiff has offered, or can offer. further proof of the inadequacy of the arbitral forum.*

As noted above, Gilmer challenged the very same arbitral system at issue here, the NYSE arbitration system, but did so only in a "generalized" way. The plaintiff to date has offered more evidence on this issue than the plaintiff did in *Gilmer.* Nevertheless, I will give the parties an opportunity to delve into this issue still further on discovery.

● *Whether, assuming that federal forum rights can be waived, were they waived in this case.*

---

7. The Supreme Court recently granted a petition for certiorari in *Oubre v. Entergy Operations,* —— U.S. ——, 117 S.Ct. 1466, 137 L.Ed.2d 680 (1997) case below, 102 F.3d 551 (5th Cir.1996)

(table opinion affirming district court's ruling). This case involves construction of the waiver standards in a claim brought under the ADEA.

The Court did not address the question of the standard governing waiver—whether it was the standard for the waiver of a statutory right, or perhaps, a constitutional waiver standard; the application of that standard to the facts at bar; and the significance of contract of adhesion concepts.

To be sure, the parties have already briefed some of these issues. In deference to the work already done, I have outlined some tentative conclusions and suggestions for further research. The record to date suggests, but by no means requires, the tentative conclusions I have outlined in the following pages.

### B. *The General Questions*

#### 1. *Does Title VII Preclude Mandatory Arbitration Of Gender Discrimination Claims?*

##### a. *The Text Of Title VII*

In 1991, certain provisions were added to Title VII, the Americans with Disabilities Act, and the Age Discrimination in Employment Act, such that "where appropriate and to the extent authorized by law ... arbitration ... is encouraged to resolve disputes arising under" these laws. Pub.L. No. 102–166, § 118, set forth in the notes following 42 U.S.C. § 1981 (1997) (" § 118"); *see also* notes following 29 U.S.C. § 626 ("The use of alternative means of dispute resolution, including settlement negotiations, conciliation, facilitation, mediation, factfinding, minitrials, and arbitration, is encouraged to resolve disputes arising under the Acts ...").[8]

On the surface, the provision is ambiguous. What does "where appropriate" mean? Does that concept embody concerns for voluntariness or contracts of adhesion or more fundamental concerns about the particular arbitral scheme? Or does it merely track judicial decisions concerning when arbitration is appropriate or required and when it is not?

*Gilmer,* decided before these amendments were passed, does not address these issues.

Two approaches have emerged. One, taken by the Seventh and Ninth Circuits, suggests that the "where appropriate" language, *inter alia,* does not permit mandatory arbitration under certain circumstances; the other, adopted by the majority of courts, holds firm to the presumption of mandatory arbitration, even in the face of challenges to the knowing and voluntariness of the waivers.

The Ninth Circuit, in *Prudential Ins., Co. of America v. Lai,* 42 F.3d 1299 (9th Cir. 1994), *cert. denied,* —— U.S. ——, 116 S. Ct. 61, 133 L.Ed.2d 24 (1995), noted:

> This congressional concern that Title VII disputes be arbitrated only 'where appropriate,' and only when such a procedure was knowingly accepted, reflects our public policy of protecting victims of sexual discrimination and harassment through the provisions of Title VII and analogous state statutes. *See Alexander,* 415 U.S. at 47, 94 S.Ct. at 1019. This is a policy that is at least as strong as our public policy in favor of arbitration.

*Id.* at 1305.

The *Lai* court suggested that the words "where appropriate" in § 118 imply that waivers must be knowing and voluntary. The court concluded the employee's waiver did not meet this standard, and remanded the case so that the district court could dismiss Prudential Insurance Company's complaint, which had sought to compel arbitration.

The Seventh Circuit, in *Pryner v. Tractor Supply Co.,* 109 F.3d 354 (7th Cir.1997), a case denying mandatory arbitration of a race and age discrimination claim in a collective bargaining setting, seemed to go even further. Referring to the "where appropriate" provisions dealing with arbitration, the court stated:

---

8. Section 118 is labeled ALTERNATIVE MEANS OF DISPUTE RESOLUTION, and states in its entirety:

> Where appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including settlement negotiations, conciliation, facilitation, mediation,

> factfinding, minitrials, and arbitration, is encouraged to resolve disputes arising under the Acts or provisions of Federal law amended by this title.

Pub.L. No. 102–166, § 118, set forth in the notes following 42 U.S.C. § 1981 (1997).

These provisions, a polite bow to the popularity of 'alternative dispute resolution' and perhaps a mild sop to the judiciary, which has expressed alarm at Congress's relentless expansion of the jurisdiction of the federal courts, encourage arbitration 'where appropriate' and if we are right it is not appropriate when it is not agreed to by the worker but instead is merely imposed by a collective bargaining agreement that he may have opposed.

*Id.* at 363.

Then, turning expressly to Title VII, the court noted:

It would be at least a mild paradox for Congress, having in another amendment that it made to Title VII in 1991 conferred a right to trial by jury for the first time, Pub.L. No. 102–166, § 102, § 1977A(c), 105 Stat. 1071, 1073 (1991), to have empowered unions in those same amendments to prevent workers from obtaining jury trials in these cases. We know that statutes, being products of compromise, frequently reflect inconsistent aims. But if that is the case here, we might expect to find a hint of it in the statutory language or design, or in the legislative history, but we find none.

*Id.*

Other courts have concluded that § 118 evinced an entirely new and very strong congressional intent to allow prospective waivers of Title VII claims through arbitration agreements; these courts minimized or failed to address claims of involuntary or coerced waiver. *Austin v. Owens–Brockway Glass Container, Inc.,* 78 F.3d 875, 882 (4th Cir.), *cert. denied,* — U.S. ——, 117 S.Ct. 432, 136 L.Ed.2d 330 (1996) ("Every case decided in the Courts of Appeal under § 118 of the 1991 amendments to the Civil Rights Act has enforced anticipatory agreements to arbitrate claims involving statutory rights." (citing cases)); *Cremin v. Merrill Lynch Pierce Fenner & Smith, Inc.,* 957 F.Supp. 1460, 1471 (N.D.Ill.1997) ("every decision since

*Gilmer* has held that Congress erected no statutory barrier to compulsory arbitration of Title VII claims" (citing cases)); *Benefits Communication Corp. v. Klieforth,* 642 A.2d 1299, 1304–05 (D.C.1994). None of these cases made allowance for a knowing and voluntary waiver exception.

#### b. *The Purposes Of Title VII*

The Supreme Court in *Gardner–Denver* emphasized the Congressional policy which gave the elimination of discrimination the highest priority. *Gardner–Denver,* 415 U.S. at 49, 94 S.Ct. at 1020. Prior to *Gilmer,* Courts of Appeals, including the First Circuit, were unanimous in concluding that any waiver of its statutory remedies in favor of arbitration, even a knowing waiver, was precluded. *See Utley v. Goldman Sachs & Co.,* 883 F.2d 184, 187 (1st Cir.1989) ("Title VII's statutory scheme and its legislative history clearly point to the conclusion that Congress intended to preclude even a temporary prospective waiver of judicial forum").

Some scholars have even suggested that race and gender discrimination are in fact different from other forms of discrimination, necessitating different procedures and standards. *See* Christine Godsil Cooper, *Where Are We Going With Gilmer—Some Ruminations on the Arbitration of Discrimination Claims,* 11 St. Louis U. Pub.L.Rev. 203, 224 (1992) (arguing that "the distinct bases of discrimination and the different procedures in each suggest that Congress intended to fight race and sex discrimination more vigorously than age discrimination").[9]

Nothing in the 1991 amendments to Title VII indicated a dilution of the original statutory purposes, which had been held inconsistent with mandatory arbitration. *See Gardner–Denver,* 415 U.S. at 47–51, 94 S.Ct. at 1019–21. Indeed, they suggested precisely the opposite. As described below, the statute created a host of new substantive and procedural protections for gender discrimination. Significantly, for the first time, the law

---

**9.** Indeed, the Supreme Court has traditionally applied only "rational-basis" review in cases involving age discrimination, as opposed to strict scrutiny in discrimination claims based on race or national origins. *See, e.g., Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 312–14, 96 S.Ct. 2562, 2566–67, 49 L.Ed.2d 520 (1976) (per curiam) (holding that state troopers over the age of fifty do not form a suspect class and "old age does not define a discrete and insular group" (citation and internal quotation marks omitted)).

guaranteed a jury trial, *see* 42 U.S.C. § 1981a(c), and compensatory as well as punitive damages. *See* 42 U.S.C. § 1981a(b). It also created new rights in mixed motive situations, *see* 42 U.S.C. § 2000e–2(m), and redefined and strengthened disparate impact claims. 42 U.S.C. § 2000e–2(k). This language is quite broad, extending to "any employment practice." *See* 42 U.S.C. § 2000e–2(m).

### c. Inherent Conflict Between Arbitration And Statutory Rights Under Title VII

Quoting *Mitsubishi*, 473 U.S. at 637, 105 S.Ct. at 3359, the *Gilmer* Court said: "[S]o long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent functions." 500 U.S. at 28, 111 S.Ct. at 1653; *LaChance, supra,* 965 F.Supp. at 185–186. The specific question, then, is whether rights available under the newly amended Title VII may be effectively vindicated in an arbitral setting.

In effect, the 1991 statute created a new species of public rights: As amended, Title VII provides for obtaining certain injunctive relief in mixed-motive situations *even where* the respondent is able to demonstrate that they "would have taken the same action *in the absence of the impermissible motivating factor.*" 42 U.S.C. § 2000e–5(g)(2)(B) (emphasis added). Should a plaintiff win declaratory and injunctive relief, but no damages, attorneys' fees and costs can still be sought. 42 U.S.C. § 2000e–5(g)(2)(B)(i).[10] Indeed, the 1991 Act underscored the "private attorneys general" role to be played by individual plaintiffs: It allows them to bring actions that might stop employers from continuing unlawful employment practices, even where

the specific plaintiff is not entitled to any individual recovery. *See Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 416, 98 S.Ct. 694, 697–98, 54 L.Ed.2d 648 (1978) (discussing how Congress intended Title VII to cast certain plaintiffs in the role of "private attorney[s] general" with respect to attorneys' fees). The 1991 amendments also strengthened the plaintiff's position in disparate impact cases, permitting such cases to proceed even in the absence of an intent to discriminate, and provided new bases for obtaining class-wide disparate impact relief. *See* 42 U.S.C. § 2000e–2(k).

Moreover, as the Seventh Circuit noted, the same statute that called for "alternative dispute resolution," established a right to a jury trial, with compensatory and punitive damages. *Pryner v. Tractor Supply Co.,* 109 F.3d 354, 362–63 (7th Cir.1997).

It is an open question at this point, whether arbitrators are able to vindicate these public rights—broad class-based injunctive relief, the ability to award punitive damages, to grant injunctions or declaratory judgments in situations in which individual claimants have no compensatory damages. To what extent can arbitrators mirror or at least not undermine "the important role played by an independent judiciary in eradicating employment discrimination?" *Gilmer,* 500 U.S. at 42, 111 S.Ct. at 1661 (Stevens, J., dissenting). And, finally, while *Gilmer* found arbitration and a federal forum comparable in some respects, in what way is arbitration the equivalent of a trial before a representative, lay jury?

### d. Legislative History

Different and apparently contradictory portions of the legislative history have been quoted throughout the case law on this issue since 1991.[11] What, then, is the significance

---

**10.** The courts, however, are not permitted in this situation to give the claimant any *individual* relief of any kind: The court "shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment, described in subparagraph (A)." 42 U.S.C. § 2000e–5(g)(2)(B)(ii). The right is to be allowed to attempt to change the discriminatory employment practice, regardless of whether it actually caused any direct harm to the complainant.

**11.** Indeed, some courts have suggested that the entire enterprise—looking at legislative history— is misplaced here. In *Klieforth,* the court found that the Act, particularly § 118, was clear on its face and thus declined to "consider the legislative history" of the statute. 642 A.2d at 1305. The *Austin* court was not "in entire agreement with the statement that it is not necessary to consider the statute's legislative history" since *Gilmer* explicitly "names legislative history as a place to look to discover Congressional intent to

of the legislative history on the issues to be resolved in the instant case?

The *Lai* court examined not only the text of § 118, but also a revealing House subcommittee report:

> Section 216 [of the 1991 Act] encourages the use of alternative means of dispute resolution ... where appropriate and to the extent authorized by law.... The Committee emphasizes ... that the use of alternative dispute resolution mechanisms is intended to supplement, not supplant, the remedies provided by Title VII. Thus, for example, the Committee believes that any agreement to submit disputed issues to arbitration, whether in the context of a collective bargaining agreement or in an employment contract, does not preclude the affected person from seeking relief under the enforcement provisions of Title VII. This view is consistent with the Supreme Court's interpretation of Title VII in *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). The Committee does not intend this section to be used to preclude rights and remedies that would otherwise be available.

H.R.Rep. No. 40(I), 102nd Cong. 1st Sess. 1991, *reprinted* in 1991 U.S.C.C.A.N. 546, 635; *Lai*, 42 F.3d at 1304. While this particular report was made by the House Education and Labor Committee and submitted on April 24, 1991, some three weeks before the Supreme Court issued its ruling in *Gilmer* (on May 13, 1991), a substantially similar report was made to the House four days *after Gilmer* was handed down, on May 17, 1991, by its Judiciary Committee. H.R. No. 102–40(II), 1991 WL 87020 (Leg.Hist.), at p. 80.

Interpretive remarks made by the chairman of the House Committee on Education and Labor, Representative Edwards, during the debate on the House floor immediately prior to the House's passage of the Act on November 7, 1991 (after the Senate had voted to pass the Act on October 30, 1991),[12] suggest that Congress, while cognizant of *Gilmer*, still eschewed mandatory arbitration. Chairman Edwards said:

> Section 118 encourages the use of alternative dispute resolution mechanisms, such as conciliation and mediation, to resolve disputes arising under Title VII when appropriate and to the extent authorized by law. This proviso is intended to supplement, not supplant, remedies provided by Title VII, and is not to be used to preclude rights and remedies that would otherwise be available. This section is intended to be consistent with decisions such as *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), which protect employees from being required to agree in advance to arbitrate disputes under Title VII and to refrain from exercising their right to seek relief under Title VII itself. This section contemplates the use of voluntary arbitration to resolve specific disputes after they have arisen, not coercive attempts to force employees in advance to forego statutory rights. No approval whatsoever is intended of the Supreme Court's recent decision in *Gilmer v. Interstate Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), or any application or extension of it to Title VII. This section is virtually identical to section 216 in H.R. 1 as previously passed by the House in this Congress and as explained in H.R.Rep. No. 102–40, 102 Cong., 1st Sess. 97 (1991).

137 Cong. Rec. H9505–01, *H9530.

These remarks were then countered by those of Representative Hyde, who, as the ranking Minority Member of the House Judiciary Committee, had previously urged (unsuccessfully) that the Act be rejected. *See* HR Rep. No. 40(II) 102nd Cong. 1st Sess., 1991 WL 87020, at p. 156–57, 161. His interpretation of § 118 was:

> This provision encourages the use of alternative means of dispute resolution, including binding arbitration, where the parties knowingly and voluntarily elect to use these methods. In light of the litigation

---

preclude arbitration of statutory claims. *Gilmer*, 500 U.S. at 26, 111 S.Ct. at 1652." *Austin*, 78 F.3d at 884 n. 3.

**12.** In both branches of Congress, the Act was passed by overwhelming majorities.

crisis facing this country and the increasing sophistication and reliability of the alternatives to litigation, there is no reason to disfavor the use of such forums. *See Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991).

137 Cong. Rec. H9505–01, \*H9548.

To what extent can these divergent portions of the legislative history be reconciled? And if they cannot, do they imply that the plaintiff has not met her burden under *Gilmer* to show that Congress intended to prohibit mandatory arbitration of Title VII claims?

### 2. Can The Plaintiff Demonstrate Systematic Arbitral Bias?

The *Gilmer* Court summarily dismissed Gilmer's "generalized attacks on arbitration" and his "speculat[ions] that arbitration panels will be biased," 500 U.S. at 30–31, 111 S.Ct. at 1654–55, noting that NYSE arbitration rules "provide protection against biased panels." *Id.* at 30, 111 S.Ct. at 1654. In order to meet *Gilmer*'s concerns, the plaintiff must show a degree of bias that cannot be cured by the usual protections offered for "biased panels." *Id.* at 30, 111 S.Ct. at 1654; *Maye v. Smith Barney Inc.,* 897 F.Supp. 100, 109 (S.D.N.Y.1995).

The *Gilmer* Court, however, did leave open the possibility that some arbitration procedures could be systematically challenged as biased. The plaintiff has offered evidence that suggests that the NYSE arbitration scheme to which her claims would be referred allows for unacceptable bias. She challenges the NYSE and NASD arbitration schemes in sexual harassment and gender discrimination cases, by citing to a report from the United States General Accounting Office ("GAO") Report on Employment Discrimination, issued in March of 1994 ("GAO Report"), and various newspaper articles.[13]

The GAO Report sheds light on some of the potential problems with the NYSE and NASD arbitration schemes. The GAO Report estimates "that most of the NYSE New York arbitrators (about 89 percent of 726 at the end of 1992) are white men averaging 60 years of age. NASD officials said the demographic composition of their arbitrator pools would generally resemble that of the NYSE New York pool." GAO Report, at p. 2. Furthermore the "NYSE and NASD procedures for selecting arbitrators for their pools and for serving on arbitration panels need improvement." *Id.* Finally, neither body "systematically assigns arbitrators to panels on the basis of subject matter expertise." *Id.* at p. 3.

While the GAO Report does "not address the fairness of the NYSE and NASD arbitration processes or the outcomes of the individual discrimination cases we reviewed [18 cases]," it does identify "weaknesses and inconsistencies in some NYSE and NASD procedures that could result in inappropriate decisions on which arbitrators they select for their pools and to serve on panels arbitrating discrimination cases." *Id.* at p. 9. Rosenberg's argument that her NYSE or NASD arbitration panel may be biased or inappropriately selected is, at least on the surface, not without some merit. *See* Robert J. Lewton, Comment, *Are Mandatory Arbitration Requirements a Viable Solution for Employers Seeking to Avoid Litigating Statutory Employment Discrimination Claims,* 59 Alb. L.Rev. 991, 1024–25 (1996) ("Facts such as those uncovered by the GAO's report undermine the *Mitsubishi* trilogy's premise that we are 'well past the time when judicial suspicion of … the competence of arbitral

---

**13.** Other courts have taken such accusations seriously. *See, e.g., Cole v. Burns Int'l Security Services,* 105 F.3d 1465, 1467 (D.C.Cir.1997) ("We are also cognizant of the numerous concerns that have been voiced by arbitrators, legal commentators, the Equal Employment Opportunity Commission ('EEOC'), and National Labor Relations Board ('NLRB') regarding the potential inequities and inadequacies of arbitration in individual employment cases, as well as their concerns about the competence of arbitrators and the arbitral forum to enforce effectively the myriad of public laws protecting workers and regulating the workplace"). Nevertheless, the Cole court found that the arbitration scheme at issue satisfied the strictures on effective arbitration addressed in *Gilmer,* and therefore "an employee who is made to use arbitration as a condition of employment 'effectively may vindicate [his or her] statutory cause of action in the arbitral forum.'" *Id. at* 1482 (quoting *Gilmer,* 500 U.S. at 28, 111 S.Ct. at 1653).

tribunals' should inhibit enforcement of the FAA 'in controversies based on statutes.' ").

At this point, however, there is not enough in the record for me to decide whether in 1997 the NYSE and NASD arbitration panels are susceptible of bias. Moreover, given the implications of such a finding, more discovery is needed.[14]

**3. Assuming The Appropriateness Of Waiving Access To Federal Forum, Do The Circumstances Of Rosenberg's Waiver Meet The Legal Standards For Waiver?**

**a. Legal Standards**

Rosenberg contends that the legal standards governing an adequate waiver of her rights to a federal forum, require that any such waiver be knowingly and voluntarily made. The defendants disagree. In *Gardner–Denver*, the Court suggested that a waiver of statutory Title VII must be "knowing and voluntary." 415 U.S. at 52 n. 15, 94 S.Ct. at 1022 n. 15; *see Lai*, 42 F.3d at 1305. Indeed, since Title VII now requires a jury trial, there is at least some question concerning whether the rights at stake are constitutionally based, i.e. the Seventh Amendment right, underscoring the need for a "knowing and voluntary" standard for the waiver of such rights.[15] As noted above, the ADEA has been expressly amended to require a voluntary and knowing waiver. *See* 29 U.S.C. § 626(f). The Court has been rigorous in examining the legitimacy of the waiver of constitutional rights in the past. *See Fuentes v. Shevin*, 407 U.S. 67, 95, 92 S.Ct. 1983, 2001–2002, 32 L.Ed.2d 556 (involving

waiver of procedural due process rights, holding that "a waiver of constitutional rights in any context must, at the very least, be clear").

**b. Assuming A "Knowing And Voluntary" Standard. Was The Prospective Waiver Of Rosenberg's Right To Have Her Claims Resolved In A Judicial Forum "Knowingly And Voluntarily" Made?**

In support of the argument that her waiver was neither knowing nor voluntary, Rosenberg submits a single short affidavit[16] in which she contends, *inter alia*, that she did not check *any* of the boxes in Item 10 of her U–4 form, including the NYSE and NASD boxes. Nor does she remember these boxes being checked when she signed the U–4 form. She further swears she was never given a copy of any rules from the SEC, NASD, NYSE or any other organization which would have indicated to her that any and all employment disputes had to be arbitrated. Rosenberg then goes on to allege that there was nothing in the Merrill Lynch Employee Handbook that mentioned arbitration.

That affidavit suggests that there is a good faith basis for the claim that there was a lack of a knowing and voluntary waiver, at least sufficient to merit further discovery. *See* William M. Howard, *Arbitrating Employment Discrimination Claims: Do You Really Want To? Do You Really Have To?*, 43 Drake L.Rev. 255, 285 (1994) (noting that to prove adhesion, an employee must do more than put forth "unsupported argument"; in-

---

**14.** Plaintiff has submitted several newspaper articles on this issue. While illuminating, I find them inappropriate for consideration and therefore they form no part of the bases for this decision.

**15.** Indeed, if there is a Seventh Amendment claim here, there is some question as to whether *Gilmer* appropriately shifts the burden of proof to the plaintiff to show that Congress did not intend to preclude mandatory arbitration.

**16.** Defendants argue that I should not consider this affidavit, since it was untimely filed. In support of this argument they cite *J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1257 (1st Cir.1996), for the proposition this affidavit is "late filed" and therefore should be viewed "with the same skepti-

cism" that the First Circuit had in reviewing "what appears to be a last ditch effort to create a disputed fact where none exists." *Id.* I find this argument to be meritless. In her affidavit, Rosenberg states that she did not check the boxes of the U–4 form herself. Her affidavit was filed in response to defendants' affidavit, which included the entirety of her U–4 form. If she did not have this document in her possession, and she truly did not check those boxes (nor does she remember them being checked when she signed the U–4 form), then it is perfectly logical and reasonable for her to raise the issue in a sworn affidavit within a few weeks of her seeing a photocopy of the U–4 form that she actually signed.

stead, employee needs to present concrete facts about arbitral forum to show arbitration is not within the employee's reasonable expectation or is oppressive or unconscionable.). Compelled arbitration has come under attack before, from both the courts and the EEOC. *See, e.g., U.S. EEOC v. River Oaks Imaging and Diagnostic,* No. 95–755 (S.D. Tex. April 19, 1995), 1995 WL 264003 at *1 (preliminarily enjoining employer's "ADR policy," which required employees to sign a mandatory arbitration policy; those who did not were deemed to have quit; court held that this policy was "misleading" and contravened the policies of Title VII).

Plainly, the issues have been joined; additional discovery is needed.

**c.** ***Was There Fraud, Or Unequal Bargaining Power Or Some Other "Contract Revocation" Ground Involved In Rosenberg's Alleged Agreement To Arbitrate?***

Plaintiffs seeking to enforce their statutory rights in a judicial forum can make fact-specific contract "revocation" arguments based on fraud or adhesion principles such as an employer's "unequal bargaining power," since such claims are "best left for resolution in specific cases." *Gilmer,* 500 U.S. at 33, 111 S.Ct. at 1656 (citing 9 U.S.C. § 2). This is a common argument in cases involving arbitration agreements *vel non* made in the context of signing U–4 forms. *See Cremin v. Merrill Lynch Pierce Fenner & Smith, Inc.,* 957 F.Supp. 1460, 1470 (N.D.Ill.1997) (involving a broker's gender and pregnancy discrimination Title VII claims, and noting "the fact that every court faced with the allegation that the U–4 is a contract of adhesion has rejected it" (citing numerous cases)).

Again, there is not enough evidence in the record for me to decide that the prospective agreement to arbitrate is revocable based on state contract formation principles, i.e. that it is a contract of adhesion or otherwise unconscionable.[17]

---

**17.** *See Mago v. Shearson Lehman Hutton Inc.,* 956 F.2d 932, 934–35 (9th Cir.1992) ("A claim of 'unequal bargaining power is best left for resolution in specific cases.' Therefore, we remand to

## IV. CONCLUSION

For the reasons stated above, the defendants' motion to compel arbitration is **DEFERRED**. With the exception of certain additional discovery and briefing, defendants' motion to stay the proceedings is **ALLOWED**.

The parties will abide by the attached scheduling order for the conduct of additional discovery and briefing.

**SO ORDERED.**

the district court for a determination on the factual issue of adhesion." (quoting *Gilmer,* 500 U.S. at 33, 111 S.Ct. at 1655–56.)).